# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AUDRICK PAYNE,

     Plaintiff,

     v.

DISTRICT OF COLUMBIA, *et al.*,

     Defendants.

Civil Action No. 08-163 (CKK)

## MEMORANDUM OPINION
(September 29, 2010)

Plaintiff Audrick Payne, a former elevator inspector with the District of Columbia

Department of Consumer and Regulatory Affairs ("DCRA"), brings this suit against the District

of Columbia, three former directors of DCRA (Linda Argo, Lisa Morgan, and Patrick Canavan),

and a supervisor at DCRA (Nicholas Majett) (collectively, "Defendants"), contending that he was

unlawfully terminated from his job because he spoke out publicly about elevator safety and

vigorously enforced elevator safety standards. This Court previously granted Defendants'

motions to dismiss Counts VI, VII, VIII, and IX of the Amended Complaint for failure to exhaust

administrative remedies. *See* [34] Order (Dec. 30, 2008). The remaining pending counts assert

violations of the D.C. Whistleblower Protection Act, D.C. Code §§ 1-615.51 *et seq.* (Count I),

and, by way of 42 U.S.C. § 1983, the First Amendment to the U.S. Constitution (Counts II, V),

and the Due Process Clause of the Fifth Amendment to the U.S. Constitution (Counts III-IV).

Presently pending before the Court is Defendants' [47] Motion for Judgment on the Pleadings

and [45] for Summary Judgment, as well as Plaintiff's [54] Motion for Leave to File Surreply.

For the reasons explained below, the Court shall grant Defendants' [47] Motion for

Judgment on the Pleadings and for Summary Judgment on the remaining counts in the Amended Complaint and deny Plaintiff's [54] Motion for Leave to File Surreply.

## I. BACKGROUND

Plaintiff Audrick Payne ("Payne") was employed as an elevator inspector with DCRA beginning on September 4, 2001. Pl.'s Stmt.[1] ¶ 1. Shortly after he started his job at DCRA, Payne became dismayed at the state of elevator safety in the District of Columbia. According to Payne, he inspected elevators that were more than twenty years overdue for inspection. *See* Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1195-99. Payne also found a number of violations which he deemed to be serious safety hazards. For example, in May 2004,[2] Payne was called to the scene of an elevator accident where a woman's body had been found in the elevator pit. *Id.* at 1223-26. Payne wrote up a number of violations at the site, but he was criticized by his supervisor. *Id.* at 1226-28. Around January or February 2005, there was a fire at a housing complex at Devonshire Place in which a 75-year old woman died. *Id.* at 1230. Payne had previously found a fire alarm violation at that complex, and third-party, i.e., non-DCRA

---

[1] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1) when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [37] Scheduling and Procedures Order at 5 (Feb. 6, 2009). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite a party's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

[2] There is conflicting testimony in the record regarding the dates of many of these incidents. However, because this information is only relevant for background purposes, the Court need not belabor the discrepancies in the record.

inspectors had been responsible for following up and ensuring compliance at the complex. *Id.* at

1230-31. Based on this and other experiences, Payne was critical of the practice of allowing

third-party inspectors to be responsible for maintaining elevator safety in the District of

Columbia. The third-party inspection program had been created by the District of Columbia in

2001 to expedite elevator inspections by allowing qualified contractors to perform inspections.

*See* Defs.' Mem., Ex. 4 (Final Investigation Report) at 2.

       In February 2005, Payne testified before the Council of the District of Columbia ("D.C.

Council") at a DCRA oversight hearing. Defs.' Stmt. ¶ 2.[3] Payne testified during his deposition

that he received a notice from DCRA management informing him that he was needed to testify

before a committee managed by D.C. Councilmember Jim Graham. *See* Defs.' Mem., Ex. 1

(Payne Dep.) at 71. Although the content of Payne's testimony is not in the record, Payne has

explained that he testified about the state of elevator safety in the District of Columbia. *See id.* at

73. Payne also testified about the need for additional staff, supplies, safety equipment, and the

incident involving the fire at Devonshire Place. *Id.* at 81-88.

       Around August 2005, the District of Columbia Office of the Inspector General ("OIG")

began an investigation into Payne. Pl.'s Stmt. ¶ 18. The investigation was predicated on a

referral from DCRA Director Patrick Canavan, who had heard from a former DCRA Chief of

Staff that there were allegations from members of the Apartment and Office Building

Association (AOBA) that Payne had solicited work as a third-party inspector for his private

consulting business while on official duty as a DCRA elevator inspector. *See* Defs.' Mem., Ex. 4

---

[3] The parties have agreed that this testimony occurred in February 2005, although it
appears from a record attached to Payne's opposition brief that this testimony may have occurred
on March 4, 2005. *See* Pl.'s Opp'n, Ex. B at 4-7 (Public Hearing Agenda and Witness List).

(Final Investigation Report) at 1. During the course of the investigation, it was alleged that Payne issued violation notices while conducting his inspections for the purpose of returning to the sites later so that he could conduct a re-inspection on overtime for higher compensation. *Id.* at 2. The OIG investigator conducted a series of interviews during his investigation, which lasted over a year. On September 14, 2005, the investigator interviewed the initial source of the complaint against Payne, AOBA Vice President Shaun Pharr, who told the investigator that she had heard complaints from AOBA members about Payne soliciting work for his private commercial business while on duty. *Id.* at 3. On November 9, 2005, the investigator interviewed Payne's supervisor, who stated he was aware of Payne's private business but assumed that Payne only conducted business in Maryland and Virginia to avoid a conflict of interest with his job at DCRA. *Id.* Payne's supervisor also explained that he received a large number of complaints about Payne for overzealous inspections. *Id.* He told the investigator that he thought Payne had become more aggressive in his inspections since the third-party inspection program started because he was seeking to find fault in the third-party inspectors' work. *Id.* On February 13, 2006, the investigator interviewed DCRA's labor relations specialist, who told him that one third-party inspector, Steven Weaver, had reported an incident in which Payne tried to convince a building manager to hire his private business. *Id.* at 4. On March 3, 2006, OIG interviewed Weaver, who said that Payne had a reputation for exaggerating the results of his inspections. *Id.* Weaver also said that Payne had tried to solicit work from him and had given Weaver his business card. *Id.* The investigator interviewed Payne on April 14, 2006 and conducted other interviews in March and May 2006. *Id.* at 4-7.

Around Thanksgiving 2005, there was an incident at the Gallery Place Apartments in

which a woman, Dawn Phillips, fell six stories out of an elevator and died. *See* Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1231, 1240. In July 2004, Payne had cited a violation at the Gallery Place Apartments for lacking a permit to install the elevators. *Id.* at 1232-33. According to Payne, Steven Weaver had been responsible for both reviewing the plans for the installation and conducting the inspection, and Payne brought this to the attention of DCRA. *Id.* at 1233-34. Following the death of Ms. Phillips, Payne talked to the press about this incident and the third-party inspection process. *Id.* at 1236, 1239.

In March 2006, Payne testified again before the D.C. Council at a DCRA oversight hearing. Defs.' Stmt. ¶ 3. Payne's testimony is not in the record, but the parties agree that Payne again testified about the state of elevator safety in the District of Columbia. Around this same time, Payne also gave information to news media about the problems he perceived in D.C.'s elevator inspection regime. Based at least in part on Payne's disclosures to the media, Fox 5 television aired a story involving violation citations issued by Payne. Pl.'s Stmt. ¶ 19. According to Payne, the day after the media report, a DCRA manager approached him and said "Payne, I watched that story and I knew you were involved." Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1244-45. There is also some evidence in the record to indicate that Defendant Linda Argo called a meeting with DCRA managers to discuss the issues raised in the Fox 5 report. *See id.*, Ex. B at 13 (3/2/2006 Email from Linda Argo to DCRA officials regarding "Fox5 report on elevators").

On November 3, 2006, the OIG issued its final report on its investigation of Payne. *See* Defs.' Mem., Ex. 4 (Final Investigation Report). The report concluded that Payne had solicited work for his personal business as a third-party inspector while on duty in violation of D.C. Code

§ 1-618.02. *Id.* at 8. However, the report concluded that Payne had not issued violation notices for the purpose of earning overtime compensation. *Id.* The Inspector General's recommendation was that appropriate action be taken against Payne. *Id.*

On November 9, 2006, DCRA terminated Payne from his position and moved him to non-pay status. Defs.' Stmt. ¶ 4. The termination letter indicated that Payne was being summarily removed based on the outcome of the OIG investigation. *See* Defs.' Mem., Ex. 5 (11/9/2006 Letter). The letter informed Payne that he had a right to administrative review of the decision by a hearing officer. *Id.* at 2. Through his union, Payne submitted a response to the information in the OIG report, which was reviewed by Hearing Officer Theresa Cusick. *See* Defs.' Mem., Ex. 6 (Report of Hr'g Officer). Ms. Cusick issued her report on February 13, 2007. Defs.' Stmt. ¶ 6.

Ms. Cusick's report found that some of the evidence in the OIG report was not credible because it was based on statements by persons without personal knowledge and for which there was no corroboration. *See* Defs.' Mem., Ex. 6 (Report of Hr'g Officer) at 4. However, Ms. Cusick found that Payne had admitted that he had a private elevator inspection business and that he had discussed that business with at least three individuals. *Id.* at 3. Based on her review of the OIG report and Payne's evidence in response, Ms. Cusick concluded that Payne distributed his private business card in the course of his official government business on more than one occasion and that he discussed his private elevator inspection business on at least one occasion while conducting official business. *Id.* at 4. Ms. Cusick noted that Payne's "defense appears to be that there was a conspiracy to 'get him' because of his frequent complaints to the Office of the Inspector General, the Council and other agencies regarding improper agency activities or

alternatively, the apartment building industry was trying to disarm him because of his rigorous attention to safety." *Id.* at 4. However, Ms. Cusick did not make any findings with respect this claim by Payne. *Id.* Ms. Cusick found by a preponderance of the evidence that Payne committed the alleged misconduct and that this conduct met the standard for summary action under D.C. personnel rules. *Id.* at 5. Ms. Cusick found, however, that the penalty of removal was not appropriate because there was no evidence that DCRA had considered mitigating factors or progressive penalties. *Id.* Accordingly, she recommended that Payne be reinstated immediately and the penalty of removal be reduced to a suspension. *Id.* at 6.

On June 27, 2007, Payne was reinstated by DCRA Acting Director Linda Argo. Defs.' Stmt. ¶ 7. The action letter stated that the summary removal of November 6, 2006 was rescinded and that Payne would be reimbursed for back pay and other benefits from that date forward. *See* Defs.' Mem., Ex. 7 (6/27/2007 Letter). Also on June 27, 2007, Director Argo issued Payne a Final Decision on Proposed Suspension for Ten (10) Days Without Pay in response to an October 11, 2006 proposed notice of suspension. Defs.' Stmt. ¶ 8. The suspension related to an incident in which Payne allegedly shut down elevators without notifying his supervisor in advance, as required by DCRA policy. *See* Defs.' Mem., Ex. 8 (6/27/2009 Letter). The suspension was to be effective from June 28, 2007 through July 12, 2007. *Id.* at 3.

On July 12, 2007, DCRA issued a Fifteen (15) Day Advance Notice of Proposed Removal, signed by Deputy Director Nicholas Majett. *See* Defs.' Mem., Ex. 9 (7/12/2007 Letter). The notice indicated that Payne was being removed because he (1) solicited elevator inspection and consulting work for his private commercial business while he was conducting business for DCRA as an elevator inspector; (2) accepted favors from persons regulated by

DCRA who had a specific interest in his decision whether or not to shut down elevators; (3) used government time for other than official business, including promotion of his private business and training of employees for that business during working hours; and (4) had been suspended for failing to comply with work instructions given by his supervisor. *Id.* at 1-2. The notice relied on evidence collected during the OIG investigation as well as evidence collected in June 2007 by DCRA. *Id.* at 2-6. The notice indicated that DCRA officials had investigated allegations that Payne solicited business and accepted a free lunch while on official duty in 2005. *Id.* at 3-4. The notice concluded that based on these violations and Payne's past disciplinary actions, the penalty of removal was appropriate. *Id.* at 5. The notice indicated that Payne had the right to file a response and have an administrative hearing. *Id.*

On September 17, 2007, Acting Director Argo issued a final decision regarding the removal and terminated Payne's employment with DCRA. Defs.' Stmt. ¶ 10. Payne submitted a written response on October 19, 2007, and November 27, 2007, he sent a letter to Acting Director Argo informing her of his intent to arbitrate the removal action. *Id.* ¶ 11. Payne filed a notice pursuant to D.C. Code § 12-309 on September 12, 2007. *Id.* ¶ 12. Payne filed this action on January 28, 2008.

On October 5, 2009, arbitrator David Weinstein of the Federal Mediation and Conciliation Service issued an Arbitration Award in favor of Payne. *See* Defs.' Mem., Ex. 12 (Arbitration Award). The issues before the arbitrator were "Did the Agency [DCRA] have cause to terminate the grievant Audrick Payne?" and "If not, what should the remedy be?" *See id.* at 2. The arbitrator found that Payne was recruited and hired by DCRA in 2001 and "was in trouble from the get-go." *Id.* at 19. The arbitrator found that Payne was appalled at the state of elevators

and elevator inspections in the District, and he particularly disliked the third-party inspection program and was not afraid to say so. *Id.* As a result, Payne was more thorough in his inspections than others and did not hesitate to cite violations, issue tickets, or even shut down elevators, frustrating the major building owners and managers in the District. *Id.* at 20. DCRA tried to terminate Payne at the end of his probationary period, but it waited too long, meaning that Payne could only be terminated for cause. *Id.* Payne continued with his job, receiving satisfactory or better performance evaluations, but he continued to be rigid in his enforcement, and he was found to be insubordinate by his supervisor in 2003, a claim that was sustained by the arbitrator. *Id.* The arbitrator noted that there were a number of complaints about Payne's elevator inspections but found that the "real issue" was Payne's handling of proven violations, which Payne enforced more harshly than other elevator inspectors. *Id.* at 21-23. The arbitrator wrote that DCRA "appears not to have come to grips with an employee intent on following the letter as well as the spirit of the law." *Id.* at 23. The arbitrator noted that Payne's supervisors gave him conflicting orders and instructions as to whether he was going too far or whether he was doing a good job. *Id.* The arbitrator found that rather than give Payne appropriate guidance as to how to do his job, DCRA tried to get rid of him as soon as possible. *Id.* at 23-24. The arbitrator found faults in the OIG investigation and concluded that DCRA accepted its findings too uncritically. *Id.* at 24-29.

The arbitrator found that Payne acknowledged that he was more rigorous than other DCRA inspectors and admitted supervisors sometimes overruled his elevator shutdowns or stop work orders but believed that they did so either because of political pressure exerted by well-connected building owners or managers or because of honest differences of opinion. *Id.* at 40-41.

Payne also acknowledged to the arbitrator that if reinstated, he would not change how he conducted inspections or sanctioned violations. *Id.* at 41. The arbitrator explained the union's position that the entire case against Payne "amounts to nothing more than the Agency's bad faith attempt to rid itself of an employee who was out of step because he actually wanted to enforce the letter of the law and who was willing to blow the whistle to achieve this goal." *Id.* at 49. However, the arbitrator did not make any findings with respect to the alleged retaliation.

Ultimately, the arbitrator found that DCRA was able to prove by a preponderance of the evidence only that Payne had promoted his personal business by distributing a few of his business cards and engaging in some discussions about his business. *Id.* at 52. The arbitrator noted that Payne thought that such low-level promotions of his own business (which operated only in Virginia and Maryland) while "off duty" did not pose any conflict of interest problems. *Id.* at 55. The arbitrator concluded, however, that Payne's actions did create a conflict of interest, or least the appearance of one, in violation of D.C. law. *Id.* at 55-56. The arbitrator also found that DCRA had failed to give Payne appropriate guidance with respect to how he could ethically promote his personal business while keeping his job as an elevator inspector. *Id.* at 58-60. The arbitrator concluded that DCRA had failed to prove that Payne engaged in egregious conduct justifying immediate removal without consideration of progressive discipline or mitigating circumstances, and therefore DCRA lacked cause to summarily remove him. *Id.* at 60. However, the arbitrator declined to determine a remedy, ordering the parties to further negotiate an appropriate remedy. *Id.* at 61-62.

## II.  LEGAL STANDARD

*A.*      *Motion for Judgment on the Pleadings*

Pursuant to Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The appropriate standard for reviewing a motion for judgment on the pleadings is "virtually identical" to that applied to a motion to dismiss under Rule 12(b)(6).  *See Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006); *Jung v. Ass'n of Am. Med. Colleges*, 339 F. Supp. 2d 26, 36 (D.D.C. 2004) ("[T]he standard of review for motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is essentially the same as that for motions to dismiss under Rule 12(b)(6).").  Because a Rule 12(c) motion "would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation," the Court must treat Defendants' motion "with the greatest of care" and deny it "if there are allegations in the complaint which, if proved, would provide a basis for recovery." *Haynesworth*, 820 F.2d at 1254.

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  Although "detailed factual allegations" are not necessary to withstand a motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a

11

formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

In evaluating either a Rule 12(c) motion for judgment on the pleadings or a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged."). However, as the Supreme Court recently made clear, a plaintiff must provide more than just "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1950. Where the well-pleaded facts set forth in the complaint do not permit a court, drawing on its judicial experience and common sense, to infer more than the "mere possibility of misconduct," the complaint has not shown that the pleader is entitled to relief. *Id.* at 1950. Moreover, the court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). If, on a motion for judgment outside the pleadings, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated

as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

B.      *Motion for Summary Judgment*

Summary judgment is proper when "the pleadings, the discovery [if any] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier of fact could find for the non-moving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis for support do not satisfy an opponent's burden to set forth "affirmative evidence" showing a genuine issue for trial. *Broaddrick v. Exec. Office of the President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham*, 813 F.2d at 1241).

### III. DISCUSSION

Defendants move for judgment on the pleadings and for summary judgment with respect to all of Payne's remaining claims. Specifically, Defendants contend, *inter alia*: that Payne's speech was not protected under the First Amendment and that Payne has failed to show his speech was a motivating factor in his termination; that Payne was afforded due process with respect to his termination; that Payne cannot establish municipal liability for the District of Columbia under 42 U.S.C. § 1983; that the individual defendants enjoy qualified immunity under § 1983; that Payne has failed to allege a *prima facie* case of hostile work environment; and that Payne has not established a *prima facie* case of retaliation under the D.C. Whistleblower Protection Act. Payne disputes these contentions. The Court shall evaluate the parties' arguments with respect to each remaining count in the Amended Complaint.

As explained below, the Court shall grant Defendants' motion for judgment on the

pleadings and for summary judgment on Payne's claims under the DCWPA because: (1) with respect to the individual Defendants, the DCWPA does not provide a cause of action against individual supervisors; (2) with respect to violations that occurred before January 28, 2007, they are barred by the statute of limitations; (3) with respect to injuries sustained before March 10, 2007, Payne failed to give notice of his claims; and (4) Payne has failed to establish a *prima facie* case of retaliation. As for Payne's First Amendment claim, the Court shall grant Defendants' motion for summary judgment because, although the Court finds that Payne spoke as a citizen on a matter of public concern, he has failed to produce evidence sufficient for a jury to conclude that there is a causal connection between his protected speech and his termination and suspension. As for Payne's due process claims, the Court shall grant Defendants' motion for summary judgment because the record clearly shows, and Payne has conceded, that he was afforded due process. The Court shall also grant Defendants' motion with respect to Payne's hostile work environment and retaliation claims because he has failed to state a separate cause of action.

> A. *Count I (D.C. Whistleblower Protection Act)*

In Count I of his Amended Complaint, Payne alleges that Defendants took adverse personnel actions against him in retaliation for his disclosures to the City Council and to the media regarding the state of elevator safety in the District of Columbia. At the time that Payne was employed by DCRA, the D.C. Whistleblower Protection Act ("DCWPA") provided, in pertinent part: "A supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order." D.C. Code § 1-615.53

(2001).[4]  The DCWPA defines "prohibited personnel action" to include recommended, threatened, or actual termination, suspension, or failure to take any favorable personnel action. *Id.* § 1-615.52(a)(5).  The statute defines a protected disclosure as:

> any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:
>
> (A) Gross mismanagement;
>
> (B) Gross misuse or waste of public resources or funds;
>
> (C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;
>
> (D) A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
>
> (E) A substantial and specific danger to the public health and safety.

D.C. Code § 1-615.52(a)(6).  A "public body" includes a member of the D.C. Council.  *Id.* § 1-615.52(a)(7)(A).  Payne contends that his statements to the D.C. Council qualify as protected disclosures under the DCWPA and that Defendants took prohibited personnel actions because of his protected disclosures.

Defendants argue that: (1) Payne's claim against the Defendants Argo, Morgan, Canavan, and Majett (collectively, the "individual Defendants") must be dismissed because the DCWPA does not provide a cause of action against individual supervisors; (2) the statute of limitations bars any claims under the DCWPA for conduct that occurred prior to January 28, 2007; (3) this Court lacks jurisdiction over any DCWPA claims with respect to Payne's allegedly wrongful

---

[4] The D.C. Whistleblower Act has since been amended, but this provision remains substantially unchanged by the amendments.  *See* D.C. Code § 1-615.53 (2010); D.C. Law 18-117, § 2(b), 45 D.C. Reg. 5147 (Mar. 11, 2010).

discharge because that issue was resolved by the arbitrator in October 2009; (4) Payne's claim is barred by his failure to provide the District of Columbia with notice in accordance with D.C. Code § 12-309; and (5) Payne has failed to make out a *prima facie* case of retaliation under the DCWPA. The Court shall address each of these contentions:

   1. <u>Claims Against Individual Defendants</u>

  Payne asserts claims under the DCWPA against both the District of Columbia and his former supervisors. However, several courts in this District have concluded that the language of the DCWPA in effect at the time the Amended Complaint was filed does not provide a cause of action against individual supervisors. *See Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 189 (D.D.C. 2007) (Friedman, J.); *Winder v. Erste*, Civil Action No. 03-2623, 2005 WL 736639, at *9 (D.D.C. May 31, 2005) (Bates, J.). The operative language is found in the enforcement provision of the DCWPA, which provides in part:

> (a) An employee aggrieved by a violation of § 1-615.53 may bring a civil action before a court or a jury in the Superior Court of the District of Columbia seeking relief and damages, including but not limited to injunction, reinstatement to the same position held before the prohibited personnel action or to an equivalent position, and reinstatement of the employee's seniority rights, restoration of lost benefits, back pay and interest on back pay, compensatory damages, and reasonable costs and attorney fees. . . . A civil action brought pursuant to this section shall comply with the notice requirements of § 12-309.

D.C. Code § 1-615.54(a) (2001). This language in this section is somewhat vague as to who may be a proper defendant in an action under the DCWPA. However, the overall context of the statute strongly suggests that this provision was intended only to authorize suits against the District of Columbia. Most of the enumerated forms of relief and damages in the statute—injunction, reinstatement, restoration of lost benefits, and back pay—are recoverable

only against the employer, the District of Columbia. The statute also requires compliance with the District's notice of claim statute, which begins "An action may not be maintained *against the District of Columbia . . . .*" D.C. Code § 12-309 (emphasis added). In addition, the DCWPA places the burden of proof "on the employing District agency to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section." *Id.* § 1-615.54(b) (2001). The fact that the burden of proof is explicitly placed on the District of Columbia indicates that the DCWPA does not contemplate that individual supervisors could be named as defendants. Therefore, this Court agrees with the other judges in this District who have found that this section does not create a private right of action against individual supervisors.

Payne argues that this is irrelevant because the D.C. Council amended the DCWPA in December 2009 to explicitly authorize actions against individual supervisors. *See* Whistleblower Protection Amendment Act of 2009, § 2(c), D.C. Code § 1-615.54(a)(1) (2010) ("An employee aggrieved by a violation of § 1-615.53 may bring a civil action against the District, and, in his or her personal capacity, any District employee, supervisors, or official having personal involvement in the prohibited personnel action . . . ."). However, the amendments to the DCWPA will save Payne's claims against individual supervisors only if the amendments are given retroactive effect. "As a general rule, statutes are to be construed as having only a prospective operation, unless there is a clear legislative showing that they are to be given a retroactive or retrospective effect." *Wolf v. D.C. Rental Accommodations Comm'n*, 414 A.2d 878, 880 n..8 (D.C. 1980); *see also Redman v. Potomac Place Assocs., LLC*, 972 A.2d 316, 319 n.4 (D.C. 2009) ("[R]etroactive applications of legislation are not to be presumed absent express

legislative language or other clear implication that such retroactivity was intended.").  Payne has

not cited, and the Court has not found, any indication that the D.C. Council intended its

amendments to the DCWPA to be retroactive.  Therefore, the Court finds that Payne's action is

governed by the language of the DCWPA prior to the 2009 amendments, which does not provide

a cause of action against individual supervisors.  Accordingly, the Court shall grant the

individual Defendants' motion for judgment on the pleadings with respect to Count I.

### 2.    Statute of Limitations

Payne filed this action on January 28, 2008.  Defendants argue that any claims relating to

actions that occurred before January 28, 2007 should be dismissed as untimely under the

DCWPA's one-year statute of limitations.  *See* D.C. Code § 1-615.54(a) (2001) ("A civil action

shall be filed within one year after a violation occurs or within one year after the employee first

becomes aware of the violation.").  Payne does not dispute that some claims may be untimely but

argues that the Court should apply the three-year statute of limitations that was included in the

statute when the D.C. Council amended the DCWPA in 2009.  Again, however, Payne has failed

to show that the D.C. Council intended to make the three-year statute of limitations retroactive.

Therefore, the Court must apply the one-year statute of limitations and bar Payne's DCWPA

claim to the extent it relies on violations that occurred (or were first discovered) before January

28, 2007.  Thus, Payne cannot challenge his initial termination in November 2006 pursuant to the

DCWPA.

### 3.    Wrongful Discharge Claim

The DCWPA provides that an aggrieved employee must elect his preferred remedy,

which may be either a civil action or an administrative remedy: "No civil action shall be brought

pursuant to § 1-615.54 if the aggrieved employee has had a final determination on the same cause of action from the Office of Employee Appeals or from an arbitrator pursuant to a negotiated grievance and arbitration procedure or an employment contract." D.C. Code § 1-615.56(b) (2001). Defendants argue that Payne's DCWPA claim is barred with respect to any claim that he was wrongfully discharged because he elected to file a grievance over his discharge, which was arbitrated by the Federal Mediation and Conciliation Service. Payne argues that the arbitration was limited to the question, "Did the Agency have cause to terminate the grievant Audrick Payne?," and there is no evidence that the arbitrator reached a decision as to his November 2006 summary termination, the June 27, 2007 suspension, or the July 12, 2007 proposed removal. Ultimately, the question for the Court is whether "the same cause of action" was before the arbitrator.

The DCWPA does not define the phrase "same cause of action." Defendants apparently argue that this phrase should be interpreted expansively to include all claims based on Payne's termination. Such an interpretation would be consistent with how causes of action are construed for purposes of *res judicata*. *See Capitol Hill Group v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 574 F. Supp. 2d , 149 (D.D.C. 2008) ("[T]here is an identity of the causes of action when the cases are based on the 'same nucleus of facts,' because 'it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.'" (quoting *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984)), *aff'd*, 569 F.3d 485, 490 (D.C. Cir. 2009). "Although preclusive effect may be given to certain administrative proceedings, it does not attach to administrative determinations that are neither final nor binding." *Hoffman v. District of Columbia*, 681 F. Supp. 2d 86, 92 (D.D.C.

2010).  Although the arbitrator's decision of October 5, 2009 appears to be a final, binding

decision, Defendants have not requested relief on grounds of *res judicata*, and it is unclear

whether that doctrine is appropriately applied in this instance.

This Court previously dismissed Payne's wrongful discharge claim on administrative

exhaustion grounds.  If Payne's DCWPA claim is part of the same cause of action as his

wrongful discharge claim, then the Court's prior ruling would effectively compel Payne to

exhaust his DCWPA claim prior to filing suit.  That result, however, would nullify the election of

remedies that Payne is allowed under the statute.  Therefore, based on the present record and the

fact that the parties did not address this issue thoroughly in their briefs, the Court shall not grant

Defendants' motion for summary judgment on this basis.

4.  Notice of Claim Statute

As noted above, the DCWPA requires an aggrieved employee to comply with the

requirements of D.C. Code § 12-309, the District of Columbia's notice of claim statute.  That

statute provides as follows:

> An action may not be maintained against the District of Columbia for unliquidated
> damages to person or property unless, within six months after the injury or damage
> was sustained, the claimant, his agent, or attorney has given notice in writing to the
> Mayor of the District of Columbia of the approximate time, place, cause, and
> circumstances of the injury or damage. A report in writing by the Metropolitan Police
> Department, in regular course of duty, is a sufficient notice under this section.

D.C. Code § 12-309.  Although the terms of § 12-309 generally apply only with respect to claims

for unliquidated damages, *see Elzeneiny v. District of Columbia*, 699 F. Supp. 2d 31, 34-35

(D.D.C. 2010), the D.C. Circuit has held that the DCWPA's incorporation of this statute requires

a party to provide notice of any claims under the DCWPA, whether or not they are for

unliquidated damages. *See Winder v. Erste*, 566 F.3d 209, 213-14 (D.C. Cir. 2009).

The record shows that Payne submitted a notice to the District of Columbia Office of Risk Management on September 10, 2007. *See* Defs.' Mem., Ex. 13 (9/10/2007 Letter). That notice explained that Payne believed he was given his initial notice of removal, his ten day suspension, and the second removal notice because of his whistleblowing activities. *See id.* at 2. This notice was not within six months of the initial termination notice in November 2006. However, it does constitute timely notice of Payne's claims that he was injured by the ten-day suspension issued on June 27, 2007, and his final termination, the notice for which was issued on July 12, 2007. At most, then, Payne is precluded from seeking compensatory and punitive damages for injuries suffered prior to March 10, 2007.

### 5. Failure to Establish a *Prima Facie* Case of Retaliation

Defendants argue that Payne's DCWPA claim must be dismissed because he has failed to establish a *prima facie* case of retaliation under the statute. The D.C. Court of Appeals has explained that claims brought under the DCWPA are subject to familiar burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Crawford v. District of Columbia*, 891 A.2d 216, 221 (D.C. 2006); *Johnson v. District of Columbia*, 935 A.2d 1113, 1118 (D.C. 2007). Under this framework, a DCWPA plaintiff must establish a *prima facie* case of retaliation by producing evidence sufficient for a jury to conclude that his protected activity was a contributing factor in the alleged prohibited personnel action. *Johnson*, 935 A.2d at 1118; D.C. Code § 1-615.54(b). Once a *prima facie* case is established, the burden shifts to the employing agency "to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had

not engaged in [protected activities]." D.C. Code § 1-615.54(b). If the employer provides such evidence, the burden is on the plaintiff to prove that the employer's explanation was pretextual. *Johnson*, 935 A.2d at 1118-19. If a plaintiff fails to produce evidence to support a finding that the proffered explanation is pretextual, summary judgment is appropriate for the employer. *See id.* at 1121-22.

Assuming *arguendo* that Payne's testimony before the D.C. Council is protected activity under the DCWPA—an assertion that Defendants dispute only halfheartedly[5]—Payne has failed to produce evidence that would enable a jury to conclude that there was a causal connection between his testimony and his termination. Payne argues that his testimony before the D.C. Council in February 2005 and March 2006 was a factor in DCRA's decisions to terminate and suspend him. However, he has produced no direct evidence that DCRA's decisions were motivated by Payne's testimony, and the circumstantial evidence based on the timing of DCRA's actions is inadequate as a matter of law. The D.C. Court of Appeals has held that when there is a four-month lapse of time between the protected disclosures and the adverse actions, there is no proof of a causal connection. *Johnson v. District of Columbia*, 935 A.2d at 1120 ("For several reasons, we reject the four-month lapse of time as proof of a causal connection between the protected disclosures and the adverse actions. . . . [E]ven a combination of 'temporal proximity' (when established) and suspicion is not enough to avoid summary judgment."). In this case, there was an eight-month gap between Payne's testimony in March 2006 and DCRA's first

---

[5] Payne addressed this issue in his opposition brief, but Defendants did not actually raise it in their summary judgment brief, although they address it briefly in their reply. Because the Court finds that Payne has failed to establish evidence sufficient to show a causal connection between his testimony and any adverse action taken against him, the Court need not address this issue.

adverse action in November 2006, and an even longer gap between his testimony and his final

suspension and termination actions in the summer of 2007. Even if all of DCRA's subsequent

actions can be traced back to November 2006, that is too far removed from Payne's testimony to

permit a jury to draw the conclusion that his testimony was a motivating factor in the decision.

The only evidence suggesting a temporal gap of less than eight months is Payne's

testimony during the arbitration hearing that he was called to the Inspector General to give a

statement regarding his third-party inspection work in April 2006, about 30 days after the "news

expose" and his testimony before the Council in March 2006. *See* Pl.'s Opp'n, Ex. A

(Arbitration Hr'g Tr.) at 1246. Payne argues that this evidence establishes that "DCRA caused

an investigation to be initiated against [him] by OIG within 30 days of his 2006 testimony before

the DC City Council." *See* Pl.'s Opp'n at 18. However, Payne concedes that the OIG

investigation began around August 2005, long before his March 2006 testimony.[6] *See* Pl.'s Stmt.

¶ 18 ("The OIG investigation that is the alleged basis for Mr. Payne's removal began in August

2005.") Therefore, the timing of Payne's interview with the OIG investigator does not suggest

that the investigation was motivated by Payne's protected activity. Even if the timing of Payne's

disclosures may have influenced the investigation by prompting critics of Payne to talk to the

OIG investigator,[7] that shows only that third parties may have tried to retaliate against Payne by

---

[6] Payne argues that the investigation began "shortly after" his first testimony before the
D.C. Council criticizing DCRA and the third-party inspection process. *See* Pl.'s Stmt. ¶ 18.
However, there was approximately a six-month gap between the beginning of the investigation
and Payne's testimony in February 2005, too long a delay to permit a jury to infer a causal
connection.

[7] The OIG report indicates that the interview of Steven Weaver, a third-party inspector
whom Payne criticized, was conducted on March 3, 2006, around the time of some of Payne's
statements to the media and testimony to the D.C. Council. *See* Defs.' Mem., Ex. 4 (Final

informing the OIG about his misconduct; it does not show that Defendants took any retaliatory action as a result of Payne's disclosures.

Payne also argues in his opposition brief that there was an ongoing effort to terminate him after his March 2006 testimony. *See* Pl.'s Opp'n at 18. In support of this assertion, he refers to pages 8-20 of Exhibit B attached to his opposition, which appears to include the following[8]: (1) an undated article in the Washington Post entitled "Elevator in Fatal Fall Malfunctioned" that states Payne "has spot-checked more than 200 inspections performed by third-party companies this year and has found problems in every case"; (2) an article in the Washington City Paper from February 2006 describing Payne's reputation as a whistleblower; (3) a Washington Post article from March 2006 describing the hearing at which Payne testified; (4) a March 2, 2006 email from Defendant Argo to other DCRA officials with no direct reference to Payne, with the script from the Fox 5 television news report on elevator safety attached; (5) a March 2007 internet news article reporting Payne's December 2006 termination; (6) a set of emails dated June 21, 2007 from individuals who were contacted by DCRA about Payne's distribution of personal business cards while on official duty; and (7) a copy of the September 20, 2007 letter giving Payne advance notice of a proposed 3-day suspension for improperly waiving a customer's business license fine. None of these documents provide any support for Payne's claim that DCRA

_____

Investigation Report) at 4. The record shows, however, that Weaver's interview occurred several months after the Dawn Phillips incident was reported in the media. *See* Pl.'s Opp'n, Ex. 1 (Arbitration Hr'g Tr.) at 1241.

[8] Payne has provided no foundation for the documents contained in Exhibit B. Defendants argue that for this reason, Payne's Exhibit B should be stricken from the record. The Court declines to strike the exhibit, however, because the Court finds that Defendants are not prejudiced by the Court's consideration of these materials.

retaliated against him in the months following his D.C. Council testimony in March 2006.

Payne argues, citing *Jones v. Bernanke*, 557 F.3d 670 (D.C. Cir. 2009), that an inference of retaliation can usually be drawn when the plaintiff puts forth evidence discrediting the employer's legitimate explanation for an adverse action. *See* 557 F.3d at 680-81 ("[S]uch evidence 'usually' is itself sufficient to allow a reasonable jury to infer retaliation."). However, that is not always the case. "[I]n some instances, . . . the fact that there are material questions as to whether the employer has given the real explanation will not suffice to support an inference of [retaliation]." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1291 (D.C. Cir. 1998) (en banc). "Sometimes an employer may offer a meritocratic or otherwise high-sounding explanation for a decision intending to cover up an unsavory reason–but one that is not illegal under the antidiscrimination laws." *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 165 F.3d 69, 72 (D.C. Cir. 1999). Here, Payne's evidence rebutting Defendants' proffered legitimate explanation shows, at most, that Defendants were eager to remove Payne because he had been a difficult employee throughout his career with DCRA. The evidence does not support an inference that the real reason for his suspension or termination was retaliation for engaging in protected activity.

Defendants contend that they took adverse actions against Payne because (1) the OIG investigation report concluded that Payne had violated D.C. Code § 1-618.02 by soliciting work for his personal business as a third-party inspector while on duty (November 9, 2006 removal); (2) he violated written work policies requiring inspectors to contact their supervisor for approval before sealing an elevator out of service (June 27, 2007 suspension); and (3) DCRA's own investigation in June 2007 found that Payne had solicited personal business while on official duty in 2005 (July 12, 2007 removal). Payne argues that these reasons are pretext for retaliation

because DCRA's decisions to remove Payne were discredited by Hearing Officer Theresa Cusick and the arbitrator, David Weinstein. However, the rulings by Ms. Cusick and Mr. Weinstein do not give rise to an inference that DCRA's actions were motivated by Payne's testimony before the D.C. Council.

Although Ms. Cusick's report found that some of the evidence in the OIG report was not credible, she agreed with the OIG's finding that Payne had engaged in conduct which met the standard for summary action under D.C. personnel rules. Similarly, the arbitrator found that Payne had in fact engaged in misconduct by promoting his personal business. The fact that DCRA failed to consider mitigating factors or follow a progressive discipline approach does suggest that, in November 2006 and June-July 2007, the agency was eager to get rid of Payne. However, there is nothing in either Ms. Cusick's report or the arbitrator's ruling that suggests the agency would not have terminated Payne but for his protected speech. To the contrary, the arbitrator's ruling indicates that DCRA wanted to get rid of Payne long before he testified before the D.C. Council in February 2005 and March 2006 because the agency disagreed with how strictly he conducted elevator inspections. While that may be an "unsavory reason" for seeking to terminate Payne, it does not point the causal arrow in the direction of Payne's protected speech. At most, the arbitrator's ruling suggests that DCRA was constantly struggling to deal with Payne during his entire tenure with the agency. Payne has failed to identify any evidence in the record that tends to show that his protected disclosures changed the agency's views about him in any material way.[9]

_____

[9] In evaluating the record, the Court relies on the facts identified by the parties in their statement of material facts filed pursuant to Local Civil Rule 7(h). *See* LCVR 7(h)(1) ("An opposition to . . . a motion [for summary judgment] shall be accompanied by a separate concise

Accordingly, the Court finds that Payne has failed to produce a genuine issue of material fact as to retaliation under the DCWPA. As noted above, the Court also finds that there is no cause of action under the DCWPA against individual supervisors. In addition, the Court finds that claims for violations occurring before January 28, 2007 are time-barred, and claims for injuries occurring before March 10, 2007, are barred for lack of notice under D.C. Code § 12-309. For all of these reasons, the Court shall grant Defendants' motion for judgment on the pleadings and for summary judgment with respect to Count I.

B.      *Count II (First Amendment)*

In Count II of the Amended Complaint, Payne contends that Defendants violated his First Amendment rights by taking adverse actions against him in retaliation for his protected speech, specifically his testimony before the D.C. Council in February 2005 and March 2006 and providing information to the media in March 2006 about the lack of regulatory oversight at DCRA. A public employee seeking to make out a claim of retaliation in violation of his First Amendment rights must meet a four-factor test: (1) the public employee must have spoken as a citizen on a matter of public concern; (2) the employee's interest in speaking on matters of public concern must outweigh the government's interest in promoting the efficiency of public services; (3) the employee must show that his speech was a substantial or motivating factor in prompting

---

statement of genuine issues setting forth *all material facts* as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the partes of the record relied upon to support the statement." (emphasis added)). The Court does not accept factual assertions by counsel that are not supported with citations to the record, nor does it scour the record for evidence that will support a party's claims. *See United States ex rel. El-Amin v. George Wash. Univ.*, 533 F. Supp. 2d 12, 19 (D.D.C. 2008) ("It is not the Court's responsibility to formulate the [party's] arguments for them or to scour the record for evidence that will support their assertions . . . .").

the retaliatory act; and (4) the employee must refute the government's showing, if made, that it would have reached the same decision in the absence of the protected speech. *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007); *Tao v. Freeh*, 27 F.3d 635, 638-39 (D.C. Cir. 1994). Defendants contend that Payne has failed to establish any of these four factors. The Court shall evaluate each of these factors in light of the evidence in the record.

1. Payne's Speech as a Citizen on a Matter of Public Concern

The record shows that Payne testified before the D.C. Council in February 2005 and March 2006 and contacted the news media in March 2006 about problems with the elevator inspection process. *See* Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1238-41. Defendants argue that Payne's speech is not protected by the First Amendment because it was made pursuant to his official duties as an elevator inspector and therefore it was not speech made by Payne in his capacity as a citizen. In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the Supreme Court explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The *Garcetti* case involved a deputy district attorney who was disciplined for recommending dismissal of a case on the basis of purported governmental misconduct; the Court held that this speech was not protected because making such recommendations was a part of his job duties. *Id.* at 421-22. Similarly, in *Wilburn v. Robinson*, 480 F.3d 1140 (D.C. Cir. 2007), the court held that a former interim director of the D.C. Office of Human Rights did not engage in protected speech when she complained about alleged discrimination by officials who refused to approve the salaries that she had requested for her employees. 480 F.3d at 1150-51. The court found that salary and hiring fell within her

employment responsibilities, as did rooting out discrimination in the District government. *Id.* at 1151. Therefore, her speech was part of her official duties and not made in her capacity as a citizen.

The case law is fairly clear that when a public employee makes comments to his supervisors on subjects directly related to his job, that speech is made pursuant to official duties and is not subject to First Amendment protection. *See Thompson v. District of Columbia*, 530 F.3d 914, 917 (D.C. Cir. 2008) ("When employees make recommendations to supervisors on subjects directly related to their jobs, they are speaking as employees even if the supervisors discourage this speech."). In this case, however, Payne went outside his chain of command and made statements to the media and to the D.C. Council about his perceived problems with DCRA's elevator inspection regime. Such statements may not be protected if it is part of the employee's job duties to make such statements. *See Winder v. Erste*, 566 F.3d at 215-16 (holding that employee's statements to D.C. Council regarding the D.C. Public Schools' failure to comply with court orders were unprotected because the employee was hired for the purpose of ensuring such compliance). The question is not whether Payne's speech was related to his job as an elevator inspector, for "[s]peech can be covered by the First Amendment even if it is related to one's job function." *Id.* at 216. Rather, the question is whether the employee's speech can be properly characterized as part of the employee's official duties. *Cf. Tao v. Freeh*, 27 F.3d at 637-39 (employee's complaint about discrimination was not made pursuant to official duties because his job as language translator did not include exposing racial discrimination in the workplace); *Wilburn*, 480 F.3d at 1151 n.16.

The record in this case does not clearly establish whether Payne's duties as an elevator

inspector might have required him to speak out about mismanagement or lapses in DCRA's oversight of the third-party inspection program. According to his Amended Complaint, Payne "was responsible for inspecting elevators in the District of Columbia and issuing citations to building owners who were not in compliance with the D.C. Code." Am. Compl. ¶ 6. If that was the sole extent of his responsibilities, then it cannot be said that his criticism of DCRA's alleged lax enforcement of regulations was made pursuant to his official duties.[10] According to a document that appears to be a job description for an elevator inspector, Payne's major duties included performing inspections and preparing inspection reports for a variety of elevator systems, issuing civil infraction citations for certain construction code violations, investigating complaints and accidents, and testifying in court as an expert witness on technical matters. *See* Pl.'s Opp'n, Ex. D at 25 (Elevator Inspector, RW-5313-13).[11] Payne was not in a management position, nor does it appear that he was specifically charged with identifying any regulatory violations beyond the elevators he was specifically charged with inspecting. In *Winder v. Erste*, the D.C. Circuit recognized that "testimony before a city council might otherwise be just the sort of citizen speech protected by the First Amendment," but held that "the uncommonly close relationship between [the employee's] duties and his advocacy before the council precludes protection." 566 F.3d at 215. However, there is no clear indication in the record that it was part

---

[10] Payne specifically avers that his testimony before the D.C. Council was outside the scope of his employment. *See* Am. Compl. ¶¶ 12, 14. However, Payne's own characterization of his testimony is not controlling.

[11] As with the documents contained in Exhibit B, Payne has provided no foundation for the documents contained in Exhibit D. The Court denies Defendants' request to strike the exhibit, however, because the Court finds that Defendants are not prejudiced by the Court's consideration of these materials. The Court's ruling as to Payne's job duties does not explicitly rely on this document describing the job duties of an elevator inspector.

of Payne's job to report lax enforcement at DCRA.

The Court notes that Payne's own statements are contradictory as to whether he gave his testimony to the D.C. Council at the urging of DCRA officials. During his deposition, Payne testified that DCRA management had selected him to testify at the February 2005 and March 2006 oversight hearings. *See* Defs.' Mem., Ex. 1 (Payne Dep.) at 71-72, 96-97. However, Payne testified at his arbitration hearing that he had decided to contact D.C. Councilmember Jim Graham and to make statements to the media. *See* Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1239-40. Therefore, the Court cannot conclude that Payne's testimony before the D.C. Council and statements to the media about perceived problems at DCRA were a part of "the tasks he was paid to perform," *Garcetti*, 547 U.S. at 422. Based on the present record, then, the Court concludes that Payne's speech was made in his capacity as a citizen rather than as a government employee.

Defendants do not seriously dispute that Payne's speech was on a matter of public concern. Payne's speech was directed to the issue of DCRA's enforcement of elevator safety regulations, and the public has a significant interest in learning whether elevators are operating safely in the District of Columbia. Accordingly, the Court finds that Payne's speech is protected by the First Amendment.

## 2.     The Government's Interest in Ensuring Efficient Government Services

The second factor in the analysis requires the Court to consider "whether the governmental interest in 'promoting the efficiency of the public services it performs through its employees' without disruption'" outweighs the employee's interest as a citizen in commenting on matters of public concern and the interest of potential audiences in hearing what the employee

has to say. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998) (quoting *Pickering v. Bd.
of Educ.*, 391 U.S. 563, 568 (1968)). In evaluating the government's interests, courts have
generally considered "whether the statement impairs discipline by superiors or harmony among
co-workers, has a detrimental impact on close working relationships for which personal loyalty
and confidence are necessary, or impedes the performance of the speaker's duties or interferes
with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).
Defendants have not argued that Payne's speech had any adverse impact on working
relationships at DCRA or otherwise impaired Payne's ability to do his job effectively. Rather,
they argue that "the District of Columbia's interest in promoting accurate and efficient testimony
at its oversight hearing" outweighs Payne's interest in speaking. That rationale is misguided,
however, because there is no indication in the record that Payne testified untruthfully before the
D.C. Council. To the contrary, there is evidence in the record that DCRA management wanted
Payne to testify, and Defendants argue that Payne did not provide the D.C. Council with any new
information. *See* Defs.' Reply at 5. Therefore, the Court finds that the government's interest in
promoting efficient government services does not outweigh Payne's interest in speaking out
about elevator safety issues.

      3.   <u>Causation</u>

In order to prevail on a First Amendment retaliation claim, a public employee must
demonstrate that his protected speech "was a substantial or motivating factor in prompting the
retaliatory or punitive act of which []he complains." *O'Donnell v. Barry*, 148 F.3d at 1133
(citing *Mt. Healthy City Sch. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The causation
requirement for a First Amendment claim is therefore much greater than the showing required to

establish a *prima facie* case of retaliation under the DCWPA, which requires only a showing that the protected activity was a "contributing factor" in the retaliatory act. *Johnson*, 935 A.2d at 1118-20; *id.* at 1120 ("[T]he standard for establishing the causation factor is an even higher hurdle for a plaintiff [asserting a First Amendment claim.]"). Although causation is normally a question of fact to be decided by the jury, a plaintiff opposing summary judgment must show that there is "evidence (either of a direct or indirect nature) from which a reasonable jury could find the required causal link between the protected disclosures . . . and the allegedly retaliatory actions." *Williams v. Johnson*, 701 F. Supp. 2d 1, 17 (D.D.C. 2010).

As explained in the context of his DCWPA claim, Payne has failed to show that there is evidence in the record sufficient to support a finding that his suspension or termination in 2007 was conducted in retaliation for his protected speech in February 2005 and March 2006. The record shows that OIG initiated its investigation into Payne in August 2005, six months after his initial testimony before the Council and eight months before his subsequent testimony and statements to the media. Payne argues that there was retaliation because, the morning after one of the media reports aired in March 2006, Payne was confronted by one of his managers who accused him of being the source and DCRA management held a meeting to discuss the media report. *See* Pl.'s Opp'n, Ex. A (Arbitration Hr'g Tr.) at 1244-45; *id.*, Ex. B at 13 (3/2/2006 Email from Linda Argo to DCRA officials regarding "Fox5 report on elevators"). At most, however, that demonstrates that DCRA was aware that Payne had made comments to the media, a revelation that could not have been surprising considering Payne's public testimony before the D.C. Council on the very same issues. It does nothing to show any connection between Payne's speech activities and his initial termination eight months later, let alone his subsequent

suspension and termination in 2007.  In the related context of retaliation under Title VII or the Americans with Disabilities Act, courts have noted that a causal inference cannot be drawn when there is an eight-month gap between the protected activity and the adverse action.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (applying Title VII and citing with approval cases in which three- and four-month periods were held insufficient to establish causation); *Mayers v. Laborers' Health & Safety Fund*, 478 F.3d 364, 369 (D.C. Cir. 2007) (applying the ADA and holding than an eight- or nine-month gap is "far too long" to infer causation by temporal proximity).

In his deposition, Payne explained his view that "retaliation . . . ties into everything pertaining to my employment with the District of Columbia."  Defs.' Mem., Ex. 1 (Payne Dep.) at 206.  However, in order to prevail on his First Amendment claim, Payne must provide some evidence suggesting that there is a connection between his speech and the adverse actions. "Mere speculation fails to create a genuine issue of material fact to avoid summary judgment." *Atanus v. Sebelius*, 652 F. Supp. 2d 4, 13 (D.D.C. 2009) (citation, internal quotation marks, and alterations omitted), *aff'd*, 2010 WL 1255937 (D.C. Cir. Mar. 2, 2010).  As the Court explained with respect to Payne's DCWPA claim, the record as a whole suggests that Payne was a difficult employee for DCRA to deal with throughout his entire tenure with the agency, which began in 2001.  Therefore, it is conceivable that Payne's D.C. Council testimony and disclosures to the media were on the long list of gripes that DCRA management had with Payne.  In order to prevail on his First Amendment claim, however, Payne must demonstrate not just that DCRA was aware of his protected speech but that it was a "substantial" or "motivating" factor in his termination.  There is no evidence in the record to support such an inference, however.  The

record does not show that DCRA management took any adverse actions against Payne in the immediate aftermath of his protected speech, nor does it show that DCRA officials considered Payne's speech in any way when they suspended or terminated him.  Accordingly, the Court finds that Payne has failed to provide evidence connecting his protected speech to the adverse actions taken against him.  Therefore, the Court shall grant Defendants' motion for summary judgment with respect to Count II.  The Court need not separately address the evidence relating to pretext, as this was discussed in the context of Payne's DCWPA claim.

Because the Court shall dismiss Payne's First Amendment claim on the merits, it shall not address Defendants' alternative arguments that Payne has failed to establish municipal liability for the District of Columbia and failed to overcome the individual Defendants' entitlement to qualified immunity.

### C.      Counts III and IV (Due Process)

In Count III of his Amended Complaint, Payne contends that Defendants violated his right to due process under the Fifth Amendment by terminating him without cause and without procedural protections.  In Count IV, Payne contends that Defendants violated his due process rights by failing to hold a pretermination hearing at which he could clear his name.  The court construes both of these claims as asserting a violation of Payne's procedural due process rights. A plaintiff asserting a violation of his Fifth Amendment right to procedural due process must establish (1) that he was deprived of a protected interest in life, liberty, or property and (2) that he did not receive the process that was due.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 56 F.3d 1469, 1471 (D.C. Cir. 1995).  The parties do not dispute that Payne had a

protected property interest in his employment as an elevator inspector. Therefore, the only question is whether the process he was afforded comports with constitutional requirements.

Defendants argue that Payne was afforded due process because he filed a grievance under the collective bargaining agreement, which provided him with a hearing before an arbitrator. In his opposition to Defendants' motion, Payne effectively concedes that he was afforded due process with respect to his termination in September 2007, arguing only that his summary removal in November 2006 was procedurally deficient. *See* Pl.'s Opp'n at 28. Because Payne failed to argue in his opposition brief that he was deprived of due process for his September 2007 termination, the Court may treat that issue as conceded. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") However, the record clearly shows that Payne appealed his November 2006 removal and presented evidence to Hearing Officer Theresa Cusick. Moreover, Defendants agreed to rescind the November 2006 summary removal and provide Payne with back pay. Therefore, any claim with respect to the November 2006 summary removal is moot. Accordingly, the Court shall grant Defendants' motion for summary judgment with respect to Counts III and IV of the Amended Complaint.

    D.    *Count V (Hostile Work Environment and Retaliation)*

In Count V of his Amended Complaint, Payne asserts a claim for "Hostile Work Environment and Retaliation and Violation of Civil Rights Under 42 U.S.C. § 1983." The allegations in this count allege that Defendants violated his First Amendment rights by creating a

hostile work environment and retaliating against him. To the extent that Payne is seeking redress for a violation of his First Amendment rights, his claim is encompassed within Count II of his Amended Complaint. Defendants construe Count V as attempting to assert a hostile work environment claim based on Payne's national origin and invoke cases involving Title VII of the Civil Rights Act of the Civil Rights Act of 1964. *See* Defs.' Mem. at 18-19. However, the Amended Complaint contains no allegations relating to Payne's national origin, and Payne does not make this argument in his opposition brief. In fact, Payne does not address his hostile work environment claim at all in his opposition brief. Therefore, the Court may treat that claim as conceded. Accordingly, the Court finds that Count V fails to assert any additional claims that have not been addressed elsewhere, and the Court shall grant Defendants' motion for judgment on the pleadings with respect to Count V.

E.      *Payne's Motion for Leave to File Surreply*

The last issue to be addressed is Payne's [54] Motion for Leave to File Surreply, which is opposed by Defendants. In his motion, Payne seeks leave to file a surreply for two purposes. First, Payne argues that a surreply is needed because Defendants raised new issues in their reply brief that he was unable to address in his opposition. However, the only new issue he identifies is the argument that Payne's meeting with Councilmember Graham and interviews with the news media are not protected speech. *See* Defs.' Reply at 2-3. The Court finds that Payne did address that issue in his opposition brief, and therefore he is not prejudiced by Defendants' failure to specifically include this item in their opening brief. Second, Payne seeks leave to submit a DVD that was admitted into evidence at his arbitration hearing and which contains Payne's testimony before the D.C. Council and his interview with the news media. Defendants object to the

admission of this DVD because it was not produced during discovery. The failure to produce

evidence in discovery generally requires exclusion of that evidence from the Court's

consideration. *See* Fed. R. Civ. P. 37(c)(a) ("If a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or a trial, unless the failure was

substantially justified or is harmless.") Moreover, in light of the Court's rulings above, the Court

finds that Payne is not prejudiced by the Court's failure to consider the contents of the DVD.

Accordingly, the Court shall deny Payne's motion for leave to file a surreply.

## IV. CONCLUSION

The Court finds that, with respect to Payne's DCWPA claims, the DCWPA does not

provide a cause of action against individual supervisors; violations that occurred before January

28, 2007, are barred by the statute of limitations; injuries sustained before March 10, 2007, are

not recoverable for failure to give timely notice; and Payne has failed to establish a *prima facie*

case of retaliation. With respect to Payne's First Amendment claim, the Court finds that Payne

spoke as a citizen on a matter of public concern but that he has failed to produce evidence

sufficient for a jury to conclude that there is a causal connection between his protected speech

and his termination and suspension. As for Payne's due process claims, the Court finds that the

record clearly shows, and Payne has conceded, that he was afforded due process. The Court also

finds that Payne has failed to state a separate cause of action for hostile work environment and

retaliation.

For the foregoing reasons, the Court shall GRANT Defendants' [47] Motion for

Judgment on the Pleadings and for [45] Summary Judgment and DENY Plaintiff's [54] Motion

for Leave to File Surreply.  An appropriate Order accompanies this Memorandum Opinion.


Date: September 29, 2010.

                                                    ___/s/_____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge